**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE COMMONWEALTH OF MASSACHUSETTS *ex rel.* [UNDER SEAL], | **CIVIL ACTION NO.** |
| Plaintiffs, | |
| v. | |
| [UNDER SEAL], | ***FILED IN CAMERA and UNDER SEAL*** |
| Defendants. | PURSUANT TO 31 U.S.C. § 3730(b)(2) |

**COMPLAINT**

**SEALED CASE – DO NOT PUT ON PACER**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE COMMONWEALTH OF MASSACHUSETTS *ex rel.* BRIAN D. SACHS,<br><br>        Plaintiffs,<br><br>v.<br><br>MARTIN E. CUTLER, M.D., and MARTIN E. CUTLER, M.D., P.C., d/b/a CUTLER EYE & SKIN CENTER,<br><br>        Defendants. | CIVIL ACTION NO.<br><br><br><br>*FILED IN CAMERA and UNDER SEAL*<br><br>*JURY TRIAL DEMANDED* |

## COMPLAINT

## INTRODUCTORY STATEMENT

1.     This is an action brought on behalf of the United States of America by Plaintiff

Brian D. Sachs (hereafter referred to as "Relator" or "Plaintiff") against Defendants Martin E.

Cutler, M.D., and Martin E. Cutler, M.D., P.C., (hereafter referred to as "Dr. Cutler" or

"Defendants") doing business as Cutler Eye & Skin Center (hereinafter referred to as "the

Center" or "Defendant"; collectively, "Defendants") pursuant to the *Qui Tam* provisions of the

Federal Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("Federal FCA" or "FCA"), and on behalf

of the Commonwealth of Massachusetts under its False Claims Act, Mass. Gen. Laws ch. 12,

§§ 5A, *et seq.*  ("Massachusetts FCA") (together referred to herein as "*Qui Tam* Action").

Pursuant to 31 U.S.C. § 3730(b)(2), and the comparable provisions in the Massachusetts FCA,

this action is brought *in camera* and under seal.  In addition, Relator brings personal claims

against Defendants for retaliation against Relator and wrongful termination of Relator's

employment in violation of the Federal and Massachusetts FCAs and other laws.

2.     Relator has direct, first-hand knowledge that Defendants have violated and are

continuing to violate the Federal and Massachusetts False Claims Acts by failing to comply with the Medicare and Medicaid reimbursement rules governing ophthalmological services and proper billing procedures.  In violation of these rules, Defendants have, among other things, intentionally engaged in fraudulent billing and claim submission practices and have subjected patients to medically unnecessary procedures. In addition, Relator alleges that Defendants unlawfully retaliated against him and wrongfully terminated his employment based on his attempts to address these billing practices and various other of Defendants' unlawful activities that Relator observed. Relator also alleges that Defendant unlawfully retaliated against him a second time, directly causing his termination from a subsequent employer.

3.     By failing to comply with these rules, since at least 2009 the Defendants have knowingly submitted and/or caused to be submitted hundreds of false or fraudulent claims to Medicare, Medicaid and/or other Government Health Care Programs in violation of the Federal and Massachusetts False Claims Acts.  On information and belief, the practices complained of herein are continuing.

4.     In addition, by failing to return or refund or notify the United States and/or the Commonwealth that Defendants have received overpayments from Medicare and/or Medicaid and/or other Government Health Care Programs, Defendants are violating and are continuing to violate the Federal and Massachusetts False Claims Acts. 31 U.S.C.§ 3729(a)(1)(G); Mass. Gen. Laws ch. 12, § 5B; *see also* 130 C.M.R. § 501.012.

5.     The Federal False Claims Act provides that any person who engages in such conduct is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the government. The Federal FCA permits relators having information regarding such conduct against the government to bring an action on behalf

of the government and to share in any recovery. The complaint must be filed under seal, without

service on the defendant. The complaint remains under seal while the government conducts an

investigation of the allegations in the complaint and determines whether to join the action. The

Massachusetts False Claims Act contains comparable provisions.

6.      Pursuant to the Federal and Massachusetts False Claims Acts, and on behalf of the

United States and Massachusetts, Relator seeks to recover damages and civil penalties arising

from Defendants' defrauding of Medicare, Medicaid, and other Government Health Insurance

Programs, as detailed below. In addition, Relator seeks to recover damages for himself

personally resulting from Defendants' unlawful retaliation and termination of his employment in

violation of the FCA and other laws.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the last of which specifically confers

jurisdiction on this Court for actions brought pursuant to the Federal FCA, 31 U.S.C. §§ 3729

and 3730, and has supplemental jurisdiction over the Massachusetts FCA claim pursuant to 31

U.S.C. § 3732(b) and 28 U.S.C. § 1367.

8.      To Relator's knowledge, this action is not barred by any provision of the Federal

or the Massachusetts FCA.  In particular, under 31 U.S.C. § 3730(e)(4)(A) (and the comparable

provision of the Massachusetts FCA), there has been no statutorily relevant public disclosure

with respect to this Complaint. Even to the extent there has been any such public disclosure,

Relator is an original source as defined by the False Claims Act in 31 U.S.C. § 3730(e)(4)(B) and

in comparable provisions of the Massachusetts FCA. *See* Mass. Gen. Laws ch. 12, § 5G (3).

9.      This Court has personal jurisdiction and venue over the Defendants pursuant to 31

U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants can be

found in, reside in, transact business in and/or have committed the alleged acts in at least

Woburn and Gloucester, Massachusetts, which are in the District of Massachusetts.

10.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because

Defendants transact business in this judicial district, and acts proscribed by 31 U.S.C. § 3729

have been committed by Defendants in this District.  Therefore, venue is proper within the

meaning of 28 U.S.C. §1391(b)-(c) and 31 U.S.C. § 3732(a).

## PARTIES

11.     The real parties in interest to this *Qui Tam* Action are the United States of

America and the Commonwealth of Massachusetts.  Accordingly, at this time, Relator is

pursuing this action on behalf of the United States of America and the Commonwealth.  *See* 31

U.S.C. § 3730(b)(1); Mass. Gen. Laws ch. 12, § 5C. He is pursuing his wrongful termination and

retaliation claims on behalf of himself personally.

12.     Relator Brian D. Sachs is a citizen of the United States of America who has direct

first hand knowledge of the activities of Defendants.  Relator was employed as an independent

contractor by Defendants from April 2010 until Defendant Cutler terminated his employment in

July 2010. Prior to joining Defendants' staff, Relator had spent many years as a medical practice

consultant, including more than fifteen years of experience as the President and CEO of a

medical billing firm. Relator Sachs is an original source of all the information contained in this

Complaint, and the facts set forth herein are based on Sachs' personal knowledge.

13.     Defendants operate  a principal place of business at 550 Main Street, Woburn,

MA.  Defendants also operate an office in Gloucester, MA, with a principal place of business at

9A Dr. Osman Babson Road. During the period of Relator's employment with Defendants, the

Gloucester office was doing business as the Gloucester Eye Center. Defendant provides

examinations, Conductive Keroplasty procedures, and other in-office services and tests. Within

the same office, Defendant also runs a medispa to provide cosmetic treatments, such as Botox,

non-surgical liposuction, and laser hair removal services, to patients, in addition to maintaining a

retail optical shop. On information and belief, approximately 70% of Defendants'

patients/customers are covered by Medicare, Medicaid, or other government health insurance

programs.

14.     Defendant Cutler is the sole owner and operator of Defendant Cutler Eye & Skin

Center. Defendant Cutler is an ophthalmologist and holds memberships with the American

Academy of Ophthalmology, the Massachusetts Medical Society, and the American Society of

Cataract and Refractive Surgeons.

## FEDERAL AND STATE HEALTH INSURANCE PROGRAMS

### Government Health Care Programs

15.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§

1395, *et seq*., (hereinafter "Medicare"), is a Health Insurance Program administered by the

Government of the United States that is funded by taxpayer revenue.  The program is overseen

by the United States Department of Health and Human Services ("HHS").  Medicare was

primarily designed to insure persons over sixty-five (65) years of age, and to provide payment

for certain hospital services, medical services, durable medical equipment, and prescription drugs

on behalf of its beneficiaries. Medicare may also cover individuals under sixty-five years of age,

like those with end-stage renal disease or severe disabilities, who are entitled to specific benefits

under the terms and conditions of the Medicare Program.  Individuals who receive benefits under

Medicare are commonly referred to as "beneficiaries." Generally speaking, Medicare Part A covers hospital, inpatient, nursing home, and other institutional care; Medicare Part B covers doctor visits and outpatient services; Medicare Part C covers alternate types of insurance plans (currently known as "Medicare Advantage" plans), and Medicare Part D provides prescription drug coverage.

16.     Reimbursement for Medicare claims is made by the United States through HHS's Center for Medicare and Medicaid Services ("CMS"), which contracts with private, regional contractors known as Medicare Administrative Contractors ("MACs") (for Parts A and B) or private insurance companies who administer the plans (for Part C) to administer and pay claims, directly or indirectly, from the Medicare Trust Fund.

17.     Medicare does not cover routine eye exams, and will only cover exams related to certain diagnostic codes or diseases. Medicare covers eyeglasses or prescription contact lenses in limited circumstances as prosthetic durable medical equipment ("DME"). Medicare only covers one pair of standard-frame eyeglasses or contact lenses after a cataract surgery with an intraocular lens.

18.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (hereafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States and is funded by State and Federal taxpayer revenue.  HHS' CMS also oversees the Medicaid Program.  Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially needy individuals that qualify for Medicaid. The States directly pay providers, with the States obtaining the federal share of the payment from accounts that draw on

the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). Massachusetts' Medicaid program is known as "MassHealth."

19.     MassHealth will generally cover a comprehensive eye examination once every twelve months for persons younger than 21 years old, and once every 24 months for persons 21 and older. Those restrictions are waived if the following patient complaints are documented in the patient record: "(a) blurred vision;  (b) evidence of headaches; (c) systemic diseases such as diabetes, hyperthyroidism, or HIV; (d) cataracts; (e) [eye] pain; (f) redness; or (g) infection." MassHealth also pays for one initial pair of eyeglasses, but only if there is a corrective power of at least +.75D sphere or +.50D cylinder. MassHealth will pay for a new pair of lenses with a different prescription only if there is a change from the current prescription of at least +.50. In some circumstances, MassHealth may also pay for lost or broken eyeglasses as well.

20.     In addition to Medicare and Medicaid, there are other federal and state programs that provide health insurance. For example, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired and deceased members.  The program is administered by the Department of Defense and funded by the Federal Government.  CHAMPUS pays for, among other items and services, tests and procedures, durable medical equipment, and prescription drugs for its beneficiaries.

21.     CHAMPUS covers eyeglasses and contact lenses only when necessary to perform the function of a human lens lost as a result of surgery/injury, after surgery for a detached retina, and lenses prescribed as treatment instead of surgery in cases of infatile glaucoma, keratoconus (corneal or scleral lenses only), abnormal tearing, or corneal irregularity.

22.     Another example is the Federal Employees Health Benefits Program ("FEHBP"), which provides health care benefits for qualified federal employees and their dependents.  It pays for, among other items and services, tests and procedures, durable medical equipment, and prescription drugs for its beneficiaries. The FEHBP does not cover vision or dental services, but these can be purchased separately through the Federal Employees Dental and Vision Insurance Program ("FEDVIP"), administered by the Office of Personnel Management ("OPM"). In addition, the federal government operates hospitals, including through its Department of Defense and its Department of Veterans Affairs.

23.     Together, Medicare, Medicaid, and any other government funded healthcare programs may be referred to herein as "Federal Health Care Programs" or "Government Health Care Programs."

## HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT

### 42 U.S.C. §§ 300gg, 1320d *et seq.*; 29 U.S.C. § 1181 *et seq.*

24.     Generally, The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and corresponding regulations ensure standards for the privacy and security of protected patient health information.

25.     HIPAA prohibits all covered entities from engaging in intimidating or retaliatory acts against any individual who refuses to violate HIPAA or who has filed a complaint, participated in an investigation, compliance review, proceeding, or hearing under HIPAA. 45 C.F.R. § 164.530(g). HIPAA provides varying civil monetary penalties for such violations.

## FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *et seq.*

26.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented any false or fraudulent claim for payment or approval, a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

27.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

28.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(G), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

29.     The Federal FCA, 31 U.S.C. § 3729(b)(2), defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse

such contractor, grantee, or other recipient for any portion of the money or property which is requested.

30.     The Federal FCA, 31 U.S.C. § 3729(b)(3), defines an "obligation" to pay as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-guarantee, or licensor- licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from the retention of any overpayment* (emphasis added)." Moreover, in the Medicare and Medicaid context, the term "obligation" is further defined as "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment [has passed]," noting that an overpayment must be reported "[b]y the later of . . . 60 days after the date on which the overpayment was identified . . . or the date any corresponding cost report is due, if applicable." Patient Protection and Affordable Care Act, March 23, 2010 ("PPACA"), Pub. L. 111-148 (Mar. 23, 2010), Section 6404(a), codified at 42 U.S.C. § 1128J9(d). *See also* 42 U.S.C. § 1320a-7k(d).

31.     The Federal FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."

32.     The Federal FCA, 31 U.S.C. § 3729(b)(4), provides that "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

33.     The Federal FCA, 31 U.S.C. § 3730(h), provides relief to employees, contractors, or agents who have been retaliated against because of lawful acts done by the employee,

contractor, or agent in furtherance of efforts to stop one or more perceived violations of the FCA.

Such retaliation may include discharge, demotion, suspension, threats, harassment or any other

type of discrimination in the terms and conditions of employment. The employee is entitled to all

relief necessary to make that employee whole, including reinstatement, two times back pay,

interest on the back pay, and compensation for any special damages, including litigation costs

and reasonable attorney's fees.

### MASSACHUSETTS FALSE CLAIMS ACT, MASS. GEN. LAWS CH. 12, §§ 5A-O

34.     The Massachusetts FCA, Mass Gen. Laws Ch. 12, § 5A *et seq.*, closely tracks the

Federal FCA.  The Massachusetts False Claims Act applies, *inter alia*, to the state portion of

Medicaid losses caused by false Medicaid claims presented to the jointly federal-state funded

Medicaid program, as well as to any failure to report and return any overpayments obtained.

Mass. Gen. Laws ch. 12, § 5B. The Massachusetts FCA contains a *qui tam* provision governing,

*inter alia*, a relator's right to claim a share of the Commonwealth's recovery. *Id.* § 5C(2) – (7).

35.     The Massachusetts FCA, Mass. Gen. Laws ch. 12, § 5B(1), makes "knowingly"

presenting or causing to be presented to any false or fraudulent claim for payment or approval, a

violation of law for which the affected government party may recover three times the amount of

the damages, including consequential damages, the government sustains and a civil monetary

penalty of between $5,000 and $10,000 per violation.

36.     The Massachusetts FCA, Mass. Gen. Laws ch. 12, § 5B(2), makes "knowingly"

making, using, or causing to be used or made a false record or statement to get a false or

fraudulent claim paid or approved a violation of law for which the affected government party

may recover three times the amount of the damages, including consequential damages, the

government sustains and a civil monetary penalty of between $5,000 and $10,000 per violation.

37.     The Massachusetts FCA, Mass. Gen. Laws ch. 12, § 5B(8), makes "knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or to transmit money or property to the commonwealth or political subdivision thereof; a violation of law for which the affected government party may recover three times the amount of the damages, including consequential damages, the government sustains and a civil monetary penalty of between $5,000 and $10,000 per violation.

38.     The Massachusetts FCA, Mass. Gen. Laws ch. 12, § 5A, defines "knowing and knowingly" to mean "possessing actual knowledge of relevant information, acting with deliberate ignorance of the truth or falsity of the information, or acting in reckless disregard of the truth or falsity of the information and no proof of specific intent to defraud is required."

39.     The Massachusetts FCA, Mass. Gen. Laws ch. 12, § 5A, defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to an officer, employee, agent or other representative of the Commonwealth, political subdivision thereof or to a contractor, subcontractor, grantee, or other person if the commonwealth or any political subdivision thereof provides any portion of the money or property which is requested or demanded, or if the Commonwealth or any political subdivision thereof will reimburse directly or indirectly such contractor, subcontractor, grantee, or other person for any portion of the money or property which is requested or demanded."

40.     The Massachusetts FCA, Mass. Gen. Laws ch. 12, § 5J, provides relief to employees, contractors, or agents who have been retaliated against in their employment because of lawful acts done by the individual in furtherance of efforts to stop one or more perceived violations of the Massachusetts FCA. Such retaliation may include discharge, demotion, suspension, threats, harassment or any other type of discrimination in the terms and conditions of

employment. The employee is entitled to all relief necessary to make that employee whole, including reinstatement/seniority status, two times back pay, interest on the back pay, and compensation for any special damages, including litigation costs and reasonable attorney's fees.

## FACTS AND ALLEGATIONS

### Rules for Reimbursement of Defendants' Services Under Government Health Care Programs

41.     The allegations of this Complaint arise from the Relator's first-hand knowledge of the Defendants' unlawful conduct, including Defendants' fraudulent and false billing of Government Health Care Programs for physician services, and Defendants' failure to repay monies due (i.e. overpayments) to those Programs.

42.     At all times relevant to this Complaint, Defendant Cutler was a Massachusetts-licensed ophthalmologist and was participating in and billing the Medicare and Medicaid programs for physician services.

43.     At all times relevant to this Complaint, Defendant Cutler Eye & Skin Center provided ophthalmic and optometry services to patients at the Center and has billed the Medicare and Medicaid programs for physician services.

44.     Approximately 70% of Defendants' patients/customers are covered by Medicare, Medicaid, and/or other Government Health Care Programs.

45.     Defendants employed and continue to employ licensed optometrists, dispensing opticians, and ophthalmic technicians, among other staff, to assist Defendant Cutler in the operation of the Cutler Eye & Skin Center.

46.     To become licensed as an ophthalmologist in the Commonwealth of Massachusetts, an applicant must have graduated from an LCME-accredited medical school, must have completed two years of post-graduate medical training in an ACGME-accredited

program, and must pass all national and state examinations. 243 C.M.R. 2.00 *et seq*. An

ophthalmologist may also be grandfathered in. Since ophthalmologists are physicians under all

applicable state laws, they are regulated by the Massachusetts Board of Registration in Medicine.

They are also regulated as physicians under the Medicare reimbursement rules.

47.     To become licensed as an optometrist, an applicant must be a graduate of an

accredited School of Optometry, must be of "good moral character," and must pass the written

and oral Board-prescribed examinations. 246 C.M.R. 2.01(2). Massachusetts optometrists are

regulated by the Board of Registration of Optometry, and can be differentiated based on their

qualifications in handling certain topical agents. *Id.*; *see also* 130 C.M.R. 402.404(A)(1). In

terms of Medicare reimbursement and participation as primary vision care provider, "[after

1987,] a doctor of optometry is considered a physician with respect to all services the optometrist

is authorized to perform under State law or regulation." Medicare Benefit Policy Manual,

Chapter 15, Section 30.4. Thus, an optometrist may apply to be a Medicare provider and may

submit claims to Medicare accordingly.

48.     To become licensed as an optician, an applicant is required to have post-

secondary education in opticianry (e.g., completed a specialized education program or a

significant apprenticeship), and is required to pass various national competency exams. *See* 235

C.M.R. 2.00 *et seq.* In Massachusetts, opticians are regulated by the Board of Registration of

Dispensing Opticians.

49.     All of the respective Boards of Registrations' regulations include deceitful or

fraudulent behavior as grounds for disciplinary action by the Board. *See* 243 C.M.R. 1.00 *et seq.*

(ophthalmologists); 246 C.M.R. 3.16 *et seq.* (optometrists); 235 C.M.R. 5.00 *et seq.* (dispensing

opticians).

50.     Medicare provides coverage for and pays claims on behalf of its beneficiaries. In the physician office setting, Medicare provides reimbursement directly to beneficiaries' physicians, and, in some cases, to their physician's staff, based on the Physician Fee Schedule (referred to herein as the "PFS"). The PFS lists more than 7,400 unique covered services and their corresponding payment levels.

51.     Each of the Government Health Care Programs requires every provider who wishes to participate in and receive payment from the program to certify and ensure the provider's compliance with various federal laws, regulations, and manuals governing the appropriate provision of health care services to beneficiaries of Government Health Care Programs. For example, physicians and hospitals enter into Provider Agreements with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program. As part of that agreement, without which the hospitals and physicians may not seek reimbursement from Federal Health Care Programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

After CMS determines that a provider is eligible for participation in the Medicare program, providers have continuing compliance, accreditation, and certification obligations in order to maintain their Medicare billing privileges. *See, e.g.*, 42 C.F.R. § 424.57. As these standards are material to Medicare reimbursement, they are considered a condition of payment: any failure to meet them can result in CMS taking adverse action against a noncompliant physician. 42 C.F.R. § 424.57(d).

52.     In Massachusetts, all ophthalmologists, optometrists, and opticians who wish to participate in the Medicaid program must enroll as a MassHealth provider, enter into a provider contract, and comply with 130 C.M.R. 402.401 *et seq.*, 130 C.M.R. 450.000, and the "Commonwealth of Massachusetts MassHealth Vision Care Manual." MassHealth vision providers are reimbursed according to the Massachusetts Division of Health Care Finance and Policy's fee schedule (the "DHCFP fee schedule"). 130 C.M.R. 402.406; *Id.* at 409.427. Participating physicians are also subject to other relevant requirements, such as mandatory participation in the Medicare program, accreditation by a CMS-approved professional organization, compliance with all underlying federal, state, and local requirements, certifications, and registrations for their specialty, compliance with 130 C.M.R. § 402.000 and § 450.000, and adherence to the CMS physician standards. *See* "Commonwealth of Massachusetts MassHealth Vision Care Manual" (incorporating 130 C.M.R. §§ 402.400-435).

53.     Medicare and other Government Health Care Programs utilize Current Procedural Terminology codes ("CPT codes") in order to determine baseline reimbursement rates and have physicians submit accurate claims to the government. CPT codes are numbers assigned to every task and service a medical practitioner may provide to a patient, including medical, surgical and diagnostic services. Properly completed claims also may include modifying codes or diagnosis codes (using the ICD-9-CM codes) to further establish medical necessity and/or help set the reimbursement rate. Plan administrators examine claims in order to interpret the CPT, modifiers, and diagnostic codes.

54.     The appropriate level of reimbursement for a particular code is set according to the Physician Fee Schedule, which is published by CMS every year.

55.     Defendants are reimbursed under Part B of Medicare (specifically, the PFS) as they provide ophthalmologic services in a physician office setting. To obtain reimbursement for services, Defendants are required to submit a completed and signed claim on CMS Form 1500, a sample copy of which is attached as **EXHIBIT A.** *See* Medicare Claims Processing Manual, Chapter 26, "Completing and Processing Form CMS-1500 Data Set."

56.     Medicare reimbursement is contingent on certain conditions, and the Program has issued rules and regulations governing reimbursement for services provided to its beneficiaries. *See generally* 42 U.S.C. § 1395m; 42 C.F.R. §§ 410.32, 424.32, 424.33, 424.51; Medicare General Information, Eligibility, and Entitlement Manual, Chapter 5, Section 70.5(b); Medicare National Coverage Determinations Manual, Chapter 1, Part 4, Section 240.2; Medicare Claims Processing Manual, Chapter 12, Section 30.6.5 "Physicians in Group Practice;" Medicare Benefit Policy Manual, Chapter 15, "Covered Medical and Other Health Services," § 30.4 - Optometrist's Services; Medicare Program Integrity Manual,  Chapter 5.

57.     Reimbursement practices under all Government Health Care Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic requirement for reimbursement eligibility under Medicare, Medicaid and other Government Health Care Programs is that the service provided must be reasonable and medically necessary. *See*, *e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. §§ 410.50, 411.15, 411.406; *United States v. Rutgard*, 116 F.3d 1270, 1275 (9th Cir. 1997) (noting TRICARE follows the same rules and regulations as Medicare); Medicare General Information, Eligibility, and Entitlement Manual, Chapter 5, Section 70.5(b) (noting that in order to be covered by Medicare, "services must be medically reasonable and necessary for the diagnosis or treatment of illness or injury").

58.     Medical providers are also not permitted to bill the government for medically unnecessary services, harmful procedures, or procedures performed solely for the profit of the provider. *See generally United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000) (procedures chosen solely for defendants' economic gain are not "medically necessary" as required by claim submission form). Health care providers are obligated to assure that services or items ordered or provided to patients will be provided "economically and only when, and the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care", and will be supported by evidence of medical necessity and quality . . . ." 42 U.S.C. § 1320c-5(a)(1)-(3).

59.     The Medicare and Medicaid programs generally do not cover screening or correction-driven interventions for eye care. *See* Medicare Policy Benefit Manual, Chapter 16, "General Exclusions from Coverage," Section 90. The Medicare program has explicitly noted that it will not pay for "[r]outine physical checkups; eyeglasses, contact lenses, and eye examinations for the purpose of prescribing, fitting, or changing eyeglasses; eye refractions . . . for whatever purpose performed; . . . [and] examinations performed without relationship to treatment or diagnosis for a specific illness, symptom, complaint, or injury . . . ." *Id.*

60.     However, ophthalmologists and optometrists, as physicians who may individually bill under Medicare and Medicaid, are not limited in practice to screening and corrective interventions alone. They are licensed to provide medical diagnosis and treatment services to patients, focusing on eye diseases such as glaucoma, astigmatism, cataracts, and retinal disorders, and addressing systemic diseases such as hypertension and diabetes. If medically necessary, these services would meet Medicare's requirement for reimbursement, as they would be "medically reasonable and necessary for the *diagnosis or treatment of illness* or injury, and []

meet all applicable coverage requirements." *See* Medicare Policy Benefits Manual, "Covered

Medical and Other Health Services," Chapter 15, Section 30.4 (emphasis added). The Medicare

regulations further specify that any such diagnostic tests reimbursable by Medicare "under the

Physicians Fee Schedule must be furnished under the appropriate level of supervision by the

physician." 42 C.F.R. § 410.32.

61.     Though the Medicare program generally excludes comprehensive eye exams as

routine "screening" visits, some exams may be covered if certain pre-conditions are met. As

noted above, Medicare coverage of a comprehensive eye exam will only be triggered if the exam

is "medically reasonable and necessary for the diagnosis or treatment of illness or injury."

Medicare Policy Benefits Manual, "Covered Medical and Other Health Services," Chapter 15,

Section 30.4. Thus, if an ophthalmologist includes a modification code related to illness or injury

when submitting a claim for a comprehensive eye exam to Medicare for reimbursement, that

comprehensive eye exam will be reimbursed. Similarly, diagnostic processes that may otherwise

be ineligible for Medicare reimbursement become eligible when certain conditions are met. For

example, intraocular photography (including the use of OCT imaging) is covered by Medicare

when it is reasonable and necessary to diagnose such conditions as "macular degeneration,

retinal neoplasms, choroid disturbances and diabetic retinopathy, or to identify glaucoma,

multiple sclerosis and other central nervous system abnormalities." Medicare National Coverage

Determinations Manual, Chapter 1, Part 1, Section 80.6.

62.     Medicaid, or, more specifically, Massachusetts' MassHealth program, will pay for

a beneficiary's comprehensive eye examination once every 24 months (or 12 months if the

beneficiary is under the age of 21). *See* 130 C.M.R. 402.426: Service Limitations: Visual

Analysis. However, the regulations indicate that multiple eye examinations in a 24-month period

will be reimbursable if certain "complaints or conditions are documented in the member's record." *Id.* at 402.426(2). Such conditions include "systemic diseases such as diabetes, hyperthyroidism, or HIV; cataracts; [or] eye pain." *Id.* at 402.426(2)(c) – (e). MassHealth will also initially pay for eyeglasses, but restrict the situations in which they will pay for contact lenses or replacement eyeglasses. *See id.* at 402.427 – 402.433.

63.     The services provided by Defendants to Medicare and Medicaid beneficiaries include comprehensive eye exams, Optical Coherence Tomography ("OCT") imaging, and other services aimed at visual health.

## Defendants' Fraudulent Acts

64.     In early 2010, Defendant Cutler approached Mr. Sachs about the possibility of procuring Mr. Sachs' services as a medical billing and general business operations consultant. Defendant Cutler indicated a desire to address various general billing, morale, and management issues that Cutler Eye & Skin Center was facing.

65.     Defendant Cutler approached Mr. Sachs as a consultant due to Mr. Sachs' decades-long prior experience as a President and CEO of a medical billing company (referred to herein as "Medical Billing Management" or "MBM"), as well as his substantial experience as a consultant to medical practices.

66.     Prior to engaging with Defendants, Mr. Sachs met with Defendant Cutler to discuss his planned approach to address the issues identified by Defendant Cutler. Mr. Sachs proposed a comprehensive review and overhaul of the Center's current practices. Defendant Cutler agreed to this approach, and offered Mr. Sachs a position at Cutler Eye & Skin Center.

67.     Mr. Sachs began working at the Cutler Eye & Skin Center on or around April 1, 2010 as a consultant and general Director of Operations. Within the first month of his

employment, Mr. Sachs began addressing the most significant shortcomings of the Center, and

initially worked very cohesively with Defendant Cutler to hire a new optometrist, Dr. Robert

Kupsc, and fill the vacant optician position with Ms. Debora Fralin, a licensed optician.

68.     Also within the first month of his employment, Mr. Sachs and Ms. Ashley

Southier, an expert outside consultant in ophthalmic billing and coding, conducted an internal

audit of the Center's patient charts.

69.     Despite these changes, Mr. Sachs began to experience for himself some of the

management and personnel issues initially identified by Defendant Cutler. Defendants displayed

an overall approach to the management of their medical practice, and a concern for compliance,

that was anything but reasonable or invested. For example, Defendants' normal business practice

was to keep identifiable patient data (e.g., patient medical records and charts) in an unlocked,

often-opened garage attached to Defendant's Woburn offices. When Mr. Sachs immediately

alerted Defendants to this serious noncompliance with federal law and regulations (including

HIPAA) , and insisted the records be moved to a properly secure location, Mr. Sachs was

ignored.

70.     Relator also observed that the personal habits of Defendant Cutler, combined with

his direct and significant control over the Center, created or sustained many inefficient and

fraudulent processes at the Center. For example, there were a significant number of occasions

where Dr. Cutler pursued his hobby of kite surfing instead of treating patients at the Center,

delegating his responsibilities to other employees like Mr. Sachs instead.

71.     Additionally, after Dr. Kupsc and Ms. Fralin were successfully hired, Defendant

Cutler remained unwaveringly adamant that Dr. Kupsc would not be allowed to bill under Dr.

Kupsc's own provider number while working at the Cutler Eye & Skin Center. Instead,

Defendant Cutler insisted Dr. Kupsc use Dr. Cutler's provider number to submit all claims arising from the Center. Defendant Cutler was clear with his staff that he would actively avoid any potential decrease in reimbursements to the Center. Defendant Cutler feared that Dr. Kupsc's optometrist-only training would trigger lower reimbursements under the PFS. Based on Mr. Sachs' firsthand observation of this practice in Defendants' patient charts, Defendant Cutler did not sign off on any of Dr. Kupsc's charts, and was not even in the office on many of the occasions that Dr. Kupsc submitted claims with Defendant Cutler's provider number. Defendant Cutler remained unmoved by reasonable arguments regarding the falsity or reckless nature of such billings and practices.

72.     In addition to the issues identified above, Mr. Sachs and Ms. Southiers' audit identified several other significant areas of the Center's noncompliance with Government Health Care Program reimbursement rules. The audit identified, in an abnormally high percentage of charts, that Defendant Cutler consistently: (1) failed to sign patient charts; (2) would questionably include the diagnostic code for "eye pain" on a large and significant percentage of claims for a complete office visit [CPT Codes 92004; 92014]; (3) would submit a claim for a complete office visit without providing required testing as part of the exam, such as a dilated fundus examination; and (4) would include the "diabetes" diagnostic code on a large and significant percentage of claims when the Optical Coherence Tomography (OCT) machine was concurrently used.

73.     Following the audit, Mr. Sachs and Ms. Southier reviewed the results with the office staff and Defendant Cutler. Defendant Cutler acknowledged the results of the audit in this meeting.

74.     Defendant Cutler allowed Mr. Sachs to continually review the Center's claims submissions, and act as an intermediary between the Center and the outside contracted billing company (MBM). As Mr. Sachs would uncover new or repeated billing issues, amounting to what Mr. Sachs believed was Medicare fraud, he would make Defendant Cutler aware of them. Mr. Sachs repeatedly expressed his concern to Defendants that the billing practices of the Center were fraudulent.

75.     However, Defendant Cutler never changed his behavior and continued to bill in fraudulent and reckless ways.

76.     Defendant Cutler also made no effort to meaningfully address the billing issues identified by Relator and Ms. Southier, or to update his business practices to accommodate the addition of Dr. Kupsc, instead refusing to comply with the Medicare requirements and demanding assurances regarding payment rates between ophthalmologists and optometrists under various insurance plans.

77.     Even after the audits, Defendant Cutler remained focused on maximizing reimbursement while retaining his fraudulent billing practices, overriding Mr. Sachs' explanations of the appropriateness of billing Government Health Care Programs for specific tests like OCT and directing Mr. Sachs to "get [the billing staff] on board and bill for the OCT's [sic] as much as possible."

78.     After Defendants had allowed Mr. Sachs access to the Center's patient records for compliance purposes for several weeks, Defendants reassigned Mr. Sachs to non-billing duties and turned the billing over to a different employee (Ms. Rebecca Church), effectively barring Mr. Sachs' access to the billing information in the patient files.

79.     Defendant Cutler was adamant that more aggressive billing tactics should be used to maximize reimbursements, distributing the motto that "[a]s far as billing, all is if [sic] fair in love and war...this is a war."

80.     During June of 2010, Mr. Sachs also became aware of Defendants' practice of allowing their ophthalmic technicians to forge physician signatures on charts and claims for payment. Mr. Sachs learned of an in-office argument between Ms. Rebecca Church, Defendant Cutler Eye & Skin Center's ophthalmic technician, and Dr. Kupsc, a physician newly employed by the Center, who was extremely angry that Ms. Church had signed a medical document in his stead.

81.     Ms. Church's defense was that it was a common business practice at the Center.

82.     Not only was Defendant Cutler put on actual notice of the serious and fraudulent manner of his billing practices, but as a physician subject to the terms and conditions of the Medicare and Medicaid Provider Enrollment Agreements and other Medicare and Medicaid statutes, regulations, and rules, Defendant Cutler has actual knowledge of the physician billing and reimbursement rules, including the obligations of medical necessity, appropriate billing procedures, and signature and ownership requirements. Defendants had an obligation, imposed as Government Health Care Program providers and recipients of federal money, to know and comply with the rules and regulations of the programs.

83.     On information and belief, Defendants are continuing to submit false and fraudulent claims to Government Health Care Programs for services rendered in violation of federal and state law.

**Defendants Knowingly and Fraudulently Billed Government Health Care Programs**

84.     Government Health Care Programs specifically preclude coverage for eye examinations performed without relationship to treatment or diagnosis for a specific illness, symptom, complaint, or injury.

85.     Government Health Care Programs also specifically prohibit medical providers from billing the government for medically unnecessary services, harmful procedures, or procedures performed solely for the profit of the provider.

86.     Defendant Cutler was aware of these prerequisites for coverage and was informed of billing requirements, as shown by his active interactions with his staff, his billing consultant Mr. Sachs, and his relationship with his outside medical billing company.

87.     Defendant Cutler submitted or caused to be submitted fraudulent claims for reimbursement by inappropriately using the CPT code for Comprehensive Eye Exams, when there was no medical necessity, treatment, or diagnostic value anticipated from the exams. The use of this code caused Defendant's claims to appear eligible for reimbursement under the Government Health Care coverage requirements when they would otherwise have been ineligible.

88.     Defendant Cutler submitted or caused to be submitted false claims for reimbursement by inappropriately using the CPT code for Comprehensive Eye Exams without performing ophthalmoscopy (a dilated fundus evaluation) as required by the code.

89.     Defendant Cutler submitted or caused to be submitted fraudulent claims for reimbursement by knowingly and routinely including the "eye pain" diagnostic code on claims made to the Government Health Care Programs for eye exams. The use of this code caused

Defendant's claim to appear eligible for reimbursement under the Government Health Care coverage requirements.

90.     Defendant Cutler submitted or caused to be submitted fraudulent claims for reimbursement by knowingly and routinely including the "diabetes" diagnostic code on claims made to the Government Health Care Programs for OCT testing. The use of this code caused Defendant's claim to appear eligible for reimbursement under the Government Health Care coverage requirements.

91.     Defendant Cutler knew that he was obtaining inappropriate compensation for medically unnecessary tests or tests that never occurred. The money received by Defendant Cutler for these claims constitutes an overpayment by the Government Health Care Programs. Defendant Cutler was clear that he had no intention of decreasing the current reimbursement rates of the Center, and made it clear he would not engage in any action that may even potentially lead to Defendants losing money.

92.     On information and belief, Defendant Cutler knowingly and routinely forced other providers, including but not limited to Dr. Kupsc, to submit Dr. Cutler's unique provider identification number instead of theirs with claims for reimbursement in an attempt to fraudulently obtain or maintain higher reimbursement rates from Government Health Care Programs. In these instances, Defendant Cutler neither furnished these services nor personally supervised the services rendered.

93.     Defendant Cutler knowingly misused his provider identification number, which resulted in improper billing of claims.

94.     Defendants refused to modify their billing practices after their billing consultants had specific conversations with Defendants regarding the use of unique provider numbers.

95.     Defendant Cutler persisted in these billing practices in reckless disregard of Mr. Sachs' audit of these practices after the audit made Defendants aware of their disproportionate use, and reinforced to the Defendants that they were fraudulent.

96.     Thus, Defendants knowingly presented or caused to be presented claims to the Government Health Care Programs for reimbursement.

97.     Defendant Cutler also knowingly made false statements on the above-mentioned claims to Government Health Care Programs for reimbursement. Without these improper modifying codes, payment to Defendant Cutler would not have been made.

98.     In addition to causing damage to programs such as Medicare and Medicaid, Defendant's actions have put patient safety and health at risk by subjecting patients to medically unnecessary procedures. Even more concerning is Defendants' apparent failure to provide ophthalmoscopy as part of a comprehensive eye examination. Defendants' have exploited at-risk populations, like diabetics, to obtain excessive reimbursement under the PFS, while simultaneously failing to provide basic tests that are required to properly manage the conditions of those populations and mitigate their risk of more serious disorders.

**Defendants Knowingly and Routinely Submitted or Caused to be Submitted False Claims**

99.     On information and belief, Defendants' routine office practices allowed staff members to forge physician signatures on important patient and billing documents.

100.    Medicare is prohibited from paying for any claim that lacks the necessary information to process the claim.

101.    Medicare considers a handwritten signature to be "a mark or sign by an individual on a document signifying knowledge, approval, acceptance or obligation." Medicare Provider Integrity Manual, Chapter 3, 3.3.2.4. Medicare does not allow for rubber-stamped or

preapproved signatures.

102.   The Medicare conditions for payment expressly require claims for services of providers to be signed by the provider. 42 C.F.R. § 424.33.

103.   In order to submit claims and receive payments from Government Health Care Programs, providers must sign their claims. Without the appropriate provider signature, a claim for reimbursement cannot be considered a complete and certified claim. Complete and accurate claims are *de facto* conditions of payment for reimbursement from Government Health Care Programs.

104.   The signature element of a claim is more than an administrative formality: rather, it serves as evidence of the provider's supervision and certification of the care provided and the claim made. The certification element of a claim to a Government Health Care Program constitutes an agreement to be bound by the applicable rules. A provider must also sign a claim in order to verify the claim's medical necessity and ensure that the claim submitted is for services actually rendered.

105.   Non-licensed staff members are ineligible to independently submit claims for reimbursement and are unauthorized to independently review and sign off on important patient care and billing documents. A claim signed by a non-licensed staff member would not be eligible for reimbursement by a Government Health Care Program.

106.   Allowing staff members to forge provider signatures without review further fails to comply with accepted standards for recordkeeping and billing procedures within the rules and regulations of the Government Health Care Programs.

107.   Defendants repeatedly falsified records that were material to a fraudulent claim.

108.   Defendants also knowingly presented or caused to be presented claims to the

Government for reimbursement when they knew such claims were fraudulent.

**Defendants Knowingly Retained and Failed to Return Overpayments**

109.    Defendants were aware of the overpayments made to Defendants after Relator's audit of Defendants' practices, Relator's presentation to Defendants and their staff, and repeated conversations with Defendants regarding upcoding, overbilling and other persistent fraudulent billing issues.

110.    Defendants also knew that they were obtaining inappropriate compensation for medically unnecessary tests or tests that never occurred. The money received by Defendants for these claims constitutes an overpayment by the Government Health Care Programs.

111.    Defendants also knew of their obligations under the Medicare Provider Integrity Provisions to report and return overpayments to the Government Health Care Programs.

112.    Defendant Cutler was clear that he had no intention of decreasing the current reimbursement rates of the Center, and made it clear he would not engage in any action that may even potentially lead to Defendants losing money.

**Defendants Retaliated Against Mr. Sachs For Engaging in Protected Activities**

113.    From May to July, 2010, Mr. Sachs continued to work to try to make positive changes to the management and billing practices of the Defendants Cutler and the Center.

114.    On or around July 24, 2010, Mr. Sachs took a scheduled vacation and was away from work. He had been working for Defendants for less than four months.

115.    On July 28, 2010, while on vacation, Mr. Sachs received an email from Defendant Cutler, letting him know that "the office voted [him] out on Friday" and that Defendants were "[g]onna have to let [him] go." A more formal letter was sent to Mr. Sachs via U.S. Post.

116.     When Mr. Sachs returned from vacation, Defendants refused to allow him to return to the office to collect his personal belongings from his desk, asserting that Mr. Sachs' appearance would "destroy the moral [sic] of the staff." Defendant Cutler similarly refused to grant Mr. Sachs an exit interview or to allow him to return to the Center at all, noting that if Mr. Sachs tried to collect his belongings, he would "call 911."

117.     Defendant Cutler initially indicated that Mr. Sachs' consumption of a beer with a colleague at a business lunch was the impetus for his discharge. As other employees, and even Defendant Cutler, had engaged in such behavior without repercussion, this preliminary explanation was clearly arbitrary and pretextual in nature. Defendant Cutler subsequently suggested Mr. Sachs' business methods and lack of suitability as a day-to-day office manager were behind his termination; however, he nevertheless asserted he "would be interested in contiuing [sic] to use [Mr. Sachs] as an independent contractor for special projects."

118.     By investigating fraudulent billing practices, making Defendants aware that such practices were occurring, and attempting to correct such practices on behalf of Defendants, Relator was engaged in activity protected by the Federal and Massachusetts False Claims Acts.

119.     After Relator made Defendants aware of the results of the internal audit in May 2010, Relator was first removed from his ability to monitor and deter continuing fraudulent billing practices, and was subsequently fired while on vacation, a mere four months since beginning his work for Defendants. Relator was not allowed to return to the office for any reason.

120.     Relator was told he was terminated for job performance issues (a lack of "staying power"), despite Defendants' interest in continuing to use Relator on "other" projects. Relator was also told that drinking a beer at lunch with another employee, despite the other employee's

30

identical behavior, was another factor in his termination. The other employee, Ms. Church, was

not fired or retaliated against for her drinking. Defendants' only justifications for Relator's

termination were pretextual, insignificant, and inconsistent alleged administrative and conduct

violations.

121.    Defendants' true reason for terminating Relator was in retaliation for Relator's

interest in addressing Defendants' fraudulent billing practices.

**Defendant Retaliated Against Mr. Sachs for Engaging in Protected Activities and Intentionally and Tortiously Interfered with Mr. Sachs' Contractual Relationships**

122.    In August 2010, Mr. Sachs filed a complaint with the federal Department of

Health and Human Services' Office of Civil Rights ("OCR"), disclosing Defendants' actions that

violated the HIPAA Privacy Rule (namely, Defendants' practice of storing patient information in

an open and unprotected garage). The OCR administers and enforces the HIPAA Privacy and

Security Rules. *See* 45 C.F.R. §§ 160, 164 *et seq.*

123.    Mr. Sachs also subsequently found employment with Dr. Anil Kumar's Advanced

Pain Management Center and Northeast Ambulatory Center, another physician practice

specializing in pain management techniques, in Stoneham, MA, in late 2010.

124.    Dr. Kumar and Defendant Cutler were friendly acquaintances of each other, and

shared mutual colleagues like Dr. Horsley. Both Dr. Kumar and Defendant Cutler were also

clients of MBM.

125.    In April 2011, Defendant Cutler became aware of an investigation by the OCR

into potential HIPAA violations. When Defendant Cutler learned of the investigation, he sent a

threatening and harassing email to Mr. Sachs on April 16, 2011. In the email, Defendant Cutler

accused Mr. Sachs of "turning [him] into [sic] Hippa [sic] vioations [sic]," and asked Mr. Sachs

whether he thought that was "the correct thing for [him] to do."

126.    In the April 16 email, Defendant Cutler further intimated actions in retaliation to Mr. Sachs' HIPAA disclosure, asking Mr. Sachs whether Defendant was "supposed to find [Mr. Sachs's] new job in Stoneham and report to the docs that [he is] working for that [he is] untrustworthy and a scoundrel [sic] and the worst type of animal." Defendant Cutler also indicated he had and would continue to alert other common professional contacts "about what a low life" Mr. Sachs was.

127.    Approximately one week after Mr. Sachs received this email from Defendant Cutler, Mr. Sachs was terminated from Dr. Kumar's practice in Stoneham.

128.    By noting HIPAA violations and other practices of Defendants that put patients' private medical information at risk, and by reporting such practices to the appropriate authorities, Relator was engaged in activity protected by the Federal and Massachusetts False Claims Acts.

129.    Defendant Cutler caused Relator to be fired from his subsequent job in retaliation for Relator's involvement in a protected activity.

130.    Defendant Cutler knew of Relator's employment relationship with Dr. Kumar in Stoneham, and knowingly and intentionally interfered with such a relationship by causing Relator to be fired from Dr. Kumar's practice, causing harm to Relator.

131.    Defendant Cutler's motive and means for interfering in Relator's subsequent employment with Dr. Kumar was improper, and was only aimed to cause Relator harm in retaliation for Relator's compliance with HIPAA reporting obligations, a law aimed to protect patients.

**Damages Caused by Defendants**

132.    Relator has reason to believe that Defendants have engaged in fraudulent activity since at least 2009 and continue to engage in such activity to this day. Relator estimates that

Defendants generate gross revenues of one million dollars per year from all payers, and between $250,000 - $400,000 annually in Medicare revenues alone.

133.    The monetary damages suffered by Government Health Care Programs since 2010 is estimated by Relator to be in excess of $1.1 million. In the last few years, Relator estimates that about 70% of the Defendants' revenue has come from Government Health Care Program beneficiaries. He further estimates that approximately 40% of the claims submitted by Defendants to Government Health Care Programs contained fraudulent billing or certification elements. Many claims submitted by Defendants should not have been made at all, and many others suffered from materially false elements that affect reimbursement rates.

134.    Furthermore, patients and other health care professionals who utilize Defendants' services are misled into believing that Defendants are is providing the level and quality of care required by law.

135.    In addition to causing damage to programs such as Medicare and Medicaid, Defendant's actions have put patient safety and health at risk by subjecting patients to medically unnecessary procedures. Even more concerning is Defendants' apparent failure to provide ophthalmoscopy (dilation) as part of a comprehensive eye examination. Defendants' have exploited at-risk populations, like diabetics, to obtain excessive reimbursement under the PFS, while simultaneously failing to provide basic tests that are required to properly manage the conditions of those populations and mitigate their risk of more serious disorders.

## CLAIMS FOR RELIEF

### COUNT ONE

**Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Knowingly Presenting or Causing to be Presented False or Fraudulent Claims**

136.    Relator realleges and incorporates by reference each and every of the foregoing

paragraphs as if fully set forth herein.

137.    This is a claim brought by Relator on behalf of the United States to recover treble damages, civil penalties and the cost of this action, under the Federal FCA, 31 U.S.C. § 3730, for Defendants' violations of 31 U.S.C. §§ 3729 *et seq.*

138.    The Federal FCA, 31 U.S.C. § 3729(a)(1)(A), imposes liability on any person who "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval . . . ." *Id.*

139.    By virtue of the above-described acts, among others, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, and on information and belief, continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

140.    The amounts and nature of the false or fraudulent claims to the Government Health Care Programs were material. Government Health Care Programs, unaware of the falsity of the claims that Defendants submitted or caused to be submitted to them, and in reliance on the accuracy thereof, paid Defendants for claims that would otherwise not have been allowed.

141.    At all times relevant to the Complaint, Defendants acted with the requisite scienter. It was foreseeable and in fact the intended result that the false claims in question would be submitted to and reimbursed by Government Health Care Programs.

142.    It is believed that as a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(A), the United States has suffered substantial losses and is therefore entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

## COUNT TWO

### Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
**Creation or Use of False Statements or Records Material to a False or Fraudulent Claim**

143.    Relator realleges and incorporates by reference each and every one of the foregoing paragraphs as if fully set forth herein.

144.    This is a claim brought by Relator on behalf of the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. § 3730 for Defendants' violations of 31 U.S.C. §§ 3729 *et seq.*

145.    The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability on "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." *Id.*

146.    By virtue of the above-described acts, among others, Defendants knowingly made used or caused to be made or used false records or statements material to false or fraudulent claims paid by the United States, and continues to do so, in violation of 31 U.S.C. § 3729(a)(1)(B).

147.    For those records and/or statements that Defendants made or used or caused to be made or used, it was foreseeable and in fact the intended result that those statements and/or records would directly result in the payment of false or fraudulent reimbursement claims.

148.    Further, at all times relevant hereto, Defendants acted with the requisite scienter.

149.    The amounts of the false or fraudulent claims caused to be paid pursuant to Defendant's false records and statements made or used or caused to be made or used to the United States were material.

150.    As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(B), the United States has suffered substantial losses and is entitled to treble damages under the False Claims

Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be made or used by Defendants.

## COUNT THREE

### Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### Knowingly Failing to Return Overpayments From Fraudulent Claims

151.    Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

152.    Through the acts described above, Defendants knowingly failed to remit funds paid by Government Health Care Programs for services ineligible for reimbursement. Defendants improperly caused providers to charge Government Health Care Programs for procedures that were not reasonable and medically necessary, and were otherwise ineligible for reimbursement.

153.    Under the False Claims Act, 31 U.S.C. § 3729(a), Defendants have violated 31 U.S.C. § 3729(a)(7) by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

154.    Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants has violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. The term "obligation" means:

> "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment..."

31 U.S.C. § 3729(b)(3). Further, in the health care context, such as Medicaid, the term

"obligation" is further defined as "Any overpayment retained by a person after the deadline for

reporting and returning the overpayment...is an obligation (as defined [in the FCA])", and an

overpayment must be reported "By the later of ...60 days after the date on which the

overpayment was identified...or the date any corresponding cost report is due, if applicable."

Patient Protection and Affordable Care Act, March 23, 2010 ("PPACA"), Pub. L. 111-148 (Mar.

23, 2010), Section 6404(a), codified at 42 U.S.C. § 1128J9(d).

155.     Despite the comprehensive audit performed by Relator and Defendants' own

actual and imputed knowledge of the rules governing the supplying, billing, and reimbursement

of physician services, and requirements of state licensing laws, Defendants have, on information

and belief, taken no steps to inform any Government Health Care Program that Defendants had

received and is retaining overpayments received over at least the last 4 years for upcoded and

otherwise fraudulent claims.

156.     Defendants' persistent fraudulent billing practices and failure to report funds

that were improperly received from Government Health Care Programs for services that were not

reasonable and medically necessary and otherwise precluded from coverage constitutes an

unlawful avoidance of an obligation to pay money owed to the United States.

157.     Defendants' unlawful conduct is continuing in nature and has caused the

United States to suffer damages.

## COUNT FOUR

### Violations of the Federal False Claims Act, 31 U.S.C. § 3729(h)
### Retaliation Against Relator

158.   Relator realleges and incorporates by reference the allegations of the foregoing

paragraphs as though fully set forth herein.

159.   The Federal False Claims Act, 31 U.S.C. § 3729(h), protects employees from retaliation by their employers: "An employee, contractor, or agent shall be entitled to all relief necessary to make [them] whole, if [they are] discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by [them] in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." *Id.*

160.   In violation of § 3730(h), Defendants took negative employment action, including terminating Relator's employment, against Relator as a result of lawful actions taken by Relator to stop Defendants' violations of the False Claims Act.

161.   Defendants violated 31 U.S.C. § 3730(h) by summarily firing Relator for auditing and attempting to correct Defendants' fraudulent billing practices. The facts show that: (1) Relator's conduct was protected under the FCA; (2) Defendants knew that he was engaged in such conduct; and (3) Defendants discharged him because of his protected conduct. By these actions, Defendants violated the False Claims Act, 31 U.S.C. § 3730(h). Defendants' conduct as alleged herein was done knowingly, maliciously, oppressively, and with conscious disregard for the rights of the Relator.

162.   Defendants also violated 31 U.S.C. § 3730(h) an additional time by causing Relator to be fired from his subsequent position. Defendant Cutler made it clear that he was angry at Relator for complaining to government authorities about Defendant Cutler's HIPAA noncompliance. Defendants were also upset enough with Relator for complaining about their fraudulent billing practices that they had terminated him a few months earlier. Relator was engaged in protected conduct under the FCA, as "'protected conduct' includes activities that

reasonably could lead to an FCA suit; in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *U.S. ex rel. Nowak v. Medtronic*, 806 F. Supp. 2d 310 (July 27, 2011); *see also* 31 U.S.C. § 3730(h).  Since HIPAA and the FCA are similarly concerned with addressing health care fraud and protecting patient privacy and confidentiality, Relator's HIPAA whistleblowing could reasonably be interpreted to lead to an FCA suit. Further, Defendant Cutler knew Relator was engaged in such conduct, and took threatening, harassing, and retaliatory action against Relator because of this protected conduct. By these actions, Defendant Cutler violated the False Claims Act, 31 U.S.C. § 3730(h). Defendant's conduct as alleged herein was done knowingly, maliciously, oppressively, and with conscious disregard for the rights of the Relator.

163.   As a result of Defendants' retaliatory and discriminatory conduct, Relator has suffered damages including, but not limited to, lost past and future earnings, lost employment benefits (*e.g.*, health insurance benefits, and retirement contributions), job-search expenses, humiliation, embarrassment, mental anguish, and severe emotional distress. Relator is entitled to two times the amount of back pay with interest, special damages, reasonable attorneys fees, and any other appropriate relief under § 3730(h) in an amount to be determined at trial.

## COUNT FIVE

### Violations Of The Massachusetts FCA,  Mass. Gen. Laws Ch. 12, § 5B(1)
### Presenting or Causing to be Presented False or Fraudulent Claims

164.   Relator realleges and incorporates herein by reference each and every one of the foregoing paragraphs as if fully set forth herein.

165.   Defendants knowingly presented or caused to be presented false or fraudulent

claims to Government Health Care Programs and the Commonwealth of Massachusetts, all in violation of the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5B(1).

166.    It is believed that as a result of Defendants' violations of the Massachusetts FCA, the Commonwealth of Massachusetts paid said claims and has sustained substantial damages, and is therefore entitled to treble damages, including consequential damages, under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false claim presented or caused to be presented by Defendant.

## COUNT SIX

### Violations Of The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5B(2)
### Creation or Use of False Statements or Records Material to a False or Fraudulent Claim

167.    Relator realleges and incorporates herein by reference each and every one of the foregoing paragraphs as if fully set forth herein.

168.    The Defendants knowingly made, used or caused to be made or used false statements material to false or fraudulent claims which were subsequently paid by Government Health Care Programs and the Commonwealth of Massachusetts, all in violation of the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5B(2).

169.    It is believed that as a result of Defendants' violations of the Massachusetts FCA, the Commonwealth of Massachusetts paid said claims and has sustained substantial damages, and is therefore entitled to treble damages, including consequential damages, under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such violation by Defendants.

## COUNT SEVEN

### Violation Of The Massachusetts False Claims Act: Mass. Gen. Laws ch. 12, § 5B(8) Making, Using, Or Causing To Be Made Or Used, A False Record Or Statement To Conceal, Avoid, Or Decrease An Obligation To Pay Or To Transmit Money Or Property To The Commonwealth

170.    Relator realleges and incorporates herein by reference each and every one of the foregoing paragraphs as if fully set forth herein.

171.    The Massachusetts FCA, Mass. Gen. Laws ch. 12, § 5B(8), makes "knowingly" making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or to transmit money or property to the Commonwealth or political subdivision thereof a violation of law for which the affected government party may recover three times the amount of the damages, including consequential damages, the government sustains and a civil monetary penalty of between $5,000 and $10,000 per violation.

172.    Defendants knowingly presented or caused to be presented to Government Health Care Programs and the Commonwealth of Massachusetts false or fraudulent claims for payment and approval, claims which failed to disclose the material violations of law, and Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, all in violation of the Massachusetts FCA, as described above.

173.    By virtue of the above-described acts, among others, Defendants knows that their violations of the Medicare (to which Medicaid may be a secondary payor) and Medicaid reimbursement rules have led to being overpaid for years. Yet, Defendants have failed to take the required and appropriate steps to satisfy the obligation owed to the Commonwealth of Massachusetts, refund or return such overpayments, or to inform Massachusetts Medicaid of the overbilling, and instead continue to retain the same, and to overbill Massachusetts Medicaid.

174.    It is believed that as a result of Defendants' violations of the Massachusetts FCA,

the Commonwealth of Massachusetts has sustained substantial damages, and is therefore entitled

to treble damages, including consequential damages, under the False Claims Act, to be

determined at trial, plus a civil penalty of $5,000 to $10,000 for each such violation.

## COUNT EIGHT

### Violations Of The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5J
### Retaliation in Violation of Public Policy and the Massachusetts False Claims Act

175.    Relator realleges and incorporates herein by reference each and every one of the

foregoing paragraphs as if fully set forth herein.

176.    The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5J, protects

employees from discriminatory rules and retaliation by their employers. "An employee,

contractor, or agent shall be entitled to all relief necessary to make [them] whole, if [they are]

discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated

against in the terms and conditions of employment because of lawful acts done by [them] in

furtherance of an action under Sections 5B to 5O, inclusive, or other efforts to stop a violation of

said sections." Mass. Gen. Laws Ch. 12, § 5J(2).

177.    Defendants violated Mass. Gen. Laws Ch. 12, § 5J by causing Relator to be fired

from his employment by Defendants as well as from his subsequent employment. Relator was

engaged in protected conduct, as mentioned *supra*. By these actions, Defendants violated the

Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5J(2). Defendants' conduct as

alleged herein was done knowingly, maliciously, oppressively, and with conscious disregard for

the rights of the Relator.

178.    As Relator's termination from his position with Defendants and his termination

from his subsequent employment were predicated on Relator's performance of important public

deeds aimed to protect patient safety and quality measures, and both terminations were directly

or indirectly controlled by Defendant Cutler, such actions by Defendants amount to terminations in violation of public policy.

179.    As a result of Defendants' retaliatory and discriminatory conduct, Relator has suffered damages including, but not limited to, lost past and future earnings, lost employment benefits (*e.g.*, health insurance benefits, and retirement contributions), job-search expenses, humiliation, embarrassment, mental anguish, and severe emotional distress. Relator is entitled to remedies including, but not limited to, two times the amount of back pay with interest, special damages, reasonable attorneys fees, and any other appropriate relief under Mass. Gen. Laws Ch. 12, § 5J(2) in an amount to be determined at trial.

## COUNT NINE

### Intentional Interference with Contractual or Advantageous Business Relationships

180.    Relator realleges and incorporates herein by reference each and every one of the foregoing paragraphs as if fully set forth herein.

181.    Massachusetts tort law protects individuals from others' knowing, intentional, and improper interference with their contractual relationships that results in harm. Massachusetts tort law also protects individuals from others' knowing, intentional, and improper interference with their current or prospective advantageous business relationships.

182.    Relator was employed pursuant to a contract with Dr. Kumar's practice, and had a reasonable expectation of continued employment with Dr. Kumar.

183.    After learning of Relator's HIPAA disclosures, Defendant Cutler sent harassing and malicious emails to Relator, and threatened to interfere with and end Relator's employment and future business relationships in retaliation for Relator's proper, legal HIPAA disclosures to

the federal government. Those threats manifested in Relator's termination from his job with Dr. Kumar.

184.   By virtue of the acts described above, Defendant Cutler acted maliciously, in bad faith, with actual malice, and outside of the scope of his authority in causing Relator to be fired from his subsequent employment and in causing harm to Relator's independent business, business relationships, and potential future clients.

185.   Defendant Cutler knowingly and intentionally interfered with Relator's contractual employment relationship with Dr. Kumar and with Relator's other advantageous business relationships.

186.   As a result of Defendants' retaliatory and discriminatory conduct, Relator has suffered damages including, but not limited to, lost past and future earnings, lost employment benefits (*e.g.*, health insurance benefits, and retirement contributions), job-search expenses, humiliation, embarrassment, mental anguish, and severe emotional distress.

## PRAYERS FOR RELIEF

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America and the Commonwealth of Massachusetts, and on his own behalf, demands and prays that judgment be entered as follows:

(a)   In favor of the United States against the Defendants for treble the amount of damages to Government Health Care Programs from the violations of the Federal FCA, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each violation;

(b)   In favor of the Relator for the maximum amount allowed as a relator share pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees and

costs;

(c)     For all costs of the Federal FCA civil action;

(d)     In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable;

(e)     In favor of the Relator and the Commonwealth of Massachusetts against Defendant in an amount equal to three times the amount of all damages that the Massachusetts Medicaid program has sustained as a result of the Defendants' actions, as well as a civil penalty against the Defendants of a statutory maximum for each violation of the Massachusetts FCA;

(f)     In favor of the Relator for the maximum amount as a relator share allowed pursuant to the Massachusetts FCA;

(g)     In favor of the Relator for all costs and expenses associated with the Massachusetts FCA claims, including attorney's fees and costs;

(h)     In favor of the Relator for all relief available under the Federal FCA and the Massachusetts FCA and Massachusetts public policy for Defendants' retaliation, including without limitation compensatory and punitive damages, two times back pay, interest (including prejudgment interest), and attorneys' fees and costs;

(i)     In favor of the Relator for all compensatory and punitive damages, prejudgment interest, and attorneys' fees and costs due to Defendants' tortious interference;

(j)     In favor of the Commonwealth of Massachusetts and the Relator for all such other relief as the Court deems just and proper; and

(k)     Such other relief as this Court deems just and appropriate.

PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

Dated:  April 17, 2014                    Respectfully submitted,


_Suzanne E. Durrell /RMT_

Suzanne E. Durrell (BBO #139280)
DURRELL LAW OFFICE
180 Williams Avenue
Milton, Massachusetts 02186
(617) 333-9681
Fax: (617) 333-0014
Email: suzanne.durrell@verizon.net


_Robert M. Thomas_

Robert M. Thomas, Jr. (BBO #645600)
THOMAS & ASSOCIATES
20 Park Plaza, Suite 833
Boston, MA 02116-4322
(617) 371-1072
Fax: (888) 676-7420
Email: rmt@thomasandassoc.net